**Leroy MALDONADO, Personal Representative of the Estate of Mark P. Maldonado, Deceased, Plaintiff–Appellant,**

v.

**Anne JOSEY, Personal Representative of the Estate of Margaret Berry, Deceased; Butch McGowen; Paul Malano, in their individual capacities only, Defendants–Appellees.**

No. 91–2176.

United States Court of Appeals, Tenth Circuit.

Sept. 16, 1992.

Stephen E. Tinkler (John B. Roesler, of Caldwell, Smith & Roesler, Santa Fe, N.M., and Ernesto J. Romero, of The Romero Law Firm, Albuquerque, N.M., with him on the briefs), Santa Fe, N.M., for plaintiff-appellant.

Kevin M. Brown (Stephen M. Williams, of Miller, Stratvert, Torgerson & Schlenker, P.A., with him on the brief), Albuquerque, N.M., for defendants-appellees.

Before SEYMOUR and TACHA, Circuit Judges, and BENSON, District Judge.[*]

TACHA, Circuit Judge.

Appellant LeRoy Maldonado appeals an order of the district court granting summary judgment in favor of appellees. On appeal, Maldonado contends that the district court erred in granting summary judgment in favor of appellees on the basis of qualified immunity. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm on different grounds.

## BACKGROUND

On March 16, 1987, Mark Maldonado, while attending Kearney Elementary School in Raton, New Mexico, became caught on his bandana in a cloakroom adjacent to his classroom and died of strangulation. Mark Maldonado was eleven years old and in the fifth grade when he died. According to the complaint, Mark Maldonado was unsupervised in the adjacent cloakroom for approximately twenty minutes. During this period, his teacher, Margaret Berry, was conducting class in the classroom and was responsible for a class of fifth grade students, including Mark Maldonado. The record does not disclose the reason for Mark Maldonado's absence from the classroom.

On August 7, 1990, LeRoy Maldonado filed an action for monetary damages under 42 U.S.C. § 1983 in the United States District Court for the District of New Mexico for the wrongful death of Mark Maldonado. The complaint asserted that the death of Mark Maldonado occurred as a direct result of Margaret Berry's failure to supervise her students and principal Paul Malano's and superintendent Butch McGowen's deliberate indifference to training and supervision requirements.

The district court granted summary judgment as to all defendants on July 8, 1991. With regard to defendants Malano and McGowen, the district court found that the plaintiff did not show "that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the school administrators can reasonably be said to have been deliberately indifferent." With regard to the teacher, the district court concluded that "[o]n March 16, 1987, the law was not clearly established as to a teacher's duty to observe every student in class for the time the students are in class." This appeal followed.

## DISCUSSION

We review summary judgment orders de novo, using the same standards the district court applies. *Osgood v. State Farm Mut. Auto. Ins. Co.,* 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

On appeal, Maldonado challenges only the district court's judgment with regard to the teacher's liability.[1] Maldonado argues that the district court erred in granting summary judgment in favor of the appellee on the basis of qualified immunity. He

---

[*] The Honorable Dee V. Benson, District Judge for the United States District Court for the District of Utah, sitting by designation.

[1] Appellant's brief states: "This appeal pertains only to the defendant-appellee classroom teacher's liability."

asserts that qualified immunity was improper because the law was clearly established on March 16, 1987. The district court concluded that it could not "find the law well established as to the supervisory duty of a teacher in a classroom." Maldonado contends that a Fourteenth Amendment liberty interest and a Fourteenth Amendment protection from deprivation of life without due process of law were implicated by the failure to provide reasonable care and safety for public grade school children and by reckless indifference to supervision requirements in a public grade school.

■ As a threshold inquiry to qualified immunity, we first must determine whether Maldonado's allegations, even if accepted as true, state a claim for violation of any rights secured under the United States Constitution. *See Siegert v. Gilley*, —— U.S. ——, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." Pursuant to 42 U.S.C. § 1983, Maldonado's claim invokes the substantive component of the Due Process Clause in that he asserts that, under the circumstances, the state was under a categorical obligation to protect Mark Maldonado. The Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), guides our determination of whether this categorical obligation arose.

In *DeShaney*, the Supreme Court held that the Due Process Clause did not impose a duty on a state to protect the life, liberty, and property of citizens from deprivations by private actors absent the "State's affirmative act of restraining the individual's freedom to act in his own behalf." *Id.* at 200, 109 S.Ct. at 1006. In that case, a state agency repeatedly received reports of the abuse of Joshua DeShaney by his father and, even after receiving these reports, did not remove the child from his father's custody. Eventually, the child suffered permanent brain damage as a result of his father's repeated beatings. The child and his mother brought an action under 42 U.S.C. § 1983 against the state officials alleging that the state agency's inaction deprived Joshua DeShaney of his liberty in violation of the Due Process Clause.

The Supreme Court began its analysis by noting that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law.'" *Id.* at 195, 109 S.Ct. at 1003. However, the Court stated that the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* The Court found that only "in certain limited circumstances [does] the Constitution impose[] upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004–05.

The Court recognized that this affirmative duty has been found to exist in only a few, limited situations. The state must provide adequate medical care to prisoners, *see Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); the state must provide involuntarily committed mental patients with services that are necessary to ensure their reasonable safety from themselves and others, *see Youngberg v. Romeo*, 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982); and suspects in police custody who have been injured while being apprehended by the police must be given medical care by the state, *see City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). The Court explicitly left open the possibility that this affirmative duty to protect could arise if "the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents." *DeShaney*, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. The Court indicated that such "a situation [might be] sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* Since *DeShaney*, we have held that a child in the state's legal and physical custody

who is placed in a private foster care facility is in a sufficiently analogous position to fall within this limited class of situations where an affirmative duty does exist. *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883 (10th Cir.1992).[2]

In declining to find an affirmative duty in *DeShaney*, the Court noted that the incarceration and institutionalization cases only demonstrate "that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* 489 U.S. at 199–200, 109 S.Ct. at 1005. Most importantly, explaining the rationale behind this principle, the Court stated that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200, 109 S.Ct. at 1005–06. The Court concluded that

> [i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1006 (footnote omitted). Thus, in light of *DeShaney*, we must decide on this appeal whether New Mexico State compulsory attendance laws[3] so restrain a school child's personal liberty that

the Due Process Clause imposes upon the state an affirmative obligation to protect that child.

We emphasize that Mark Maldonado's situation does not fall within the cases holding that extreme corporal punishment, or sexual abuse and harassment by a school teacher or counselor, can violate the substantive due process rights of school children. In *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977), the Supreme Court held that "where school authorities, acting under color of state law, deliberately decide[ ] to punish a child for misconduct by restraining the child and inflicting appreciable physical pain," Fourteenth Amendment liberty interests are implicated. In *Garcia v. Miera*, 817 F.2d 650, 654 (10th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), we held that *Ingraham* "clearly signaled that, at some degree of excessiveness or cruelty, the meting out [of] such punishment violates the substantive due process rights of the pupil." Similarly, the Third Circuit has held that school authorities could be found liable for establishing and maintaining a policy, practice, or custom with deliberate indifference to the consequences when a student was sexually abused by her teacher. *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir.1989) (en banc), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (*Stoneking II*). The court expressly distinguished *DeShaney* and stated that "[n]othing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates." *Id.* at 725.

In the corporal punishment and sexual abuse contexts, a state actor directly inflicts the harm on the student and thereby

---

**2.** Three other circuits have reached the same conclusion. *See K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981).

**3.** The New Mexico Constitution, art. XII, § 6 provides that "[e]very child of school age and of sufficient physical and mental ability shall be required to attend a public or other school during such a period and for such time as may be prescribed by law." *See also* N.M.Stat.Ann. §§ 22–12–1 to 22–12–7 (Michie 1978).

implicates the Due Process Clause which itself imposes limitations on state conduct. In contrast, this case does not directly implicate these substantive due process concerns because regardless of whether the school teacher could have prevented the harm, she did not directly inflict Mark Maldonado's injury. Thus, this case bears a closer resemblance to *DeShaney,* where the harm was inflicted by a private actor, than to *Garcia,* where a state actor inflicted the injury on a student. The resemblance between this case and *DeShaney* explains why our discussion of the relationship between the state and public school students in *Hilliard v. City and County of Denver,* 930 F.2d 1516 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991), is inapposite.

In *Hilliard,* the police arrested the driver of an automobile and left the female passenger stranded in the automobile. The police left the passenger without keys to the automobile due to her intoxicated state; a third person subsequently robbed and sexually assaulted her. We reviewed *Ingraham* and concluded that "it was not clearly established in 1988 that someone whose person was not under some degree of physical control by the state or who was not involved in a fourth amendment search or seizure would have a clearly established, constitutionally protected liberty interest." *Id.* at 1520.

In reaching this conclusion, we briefly discussed the relationship between school children and the state. We stated that

> [p]ublic school students, although not restricted to the same degree as arrestees, convicts and patients involuntarily committed to state mental hospitals, are similarly involved in an environment where the state has some lawful control over their liberty. Students are required by state law to attend school and thus are prevented by the state from voluntarily withdrawing from situations posing the risk of personal injury.

*Id.* Read in context, our discussion in *Hilliard* suggests only that a party pursuing a substantive due process claim under *Ingraham* must allege that she was subject to at least the same degree of restraint that the state imposed upon public school children. As we have already noted, however, the present case does not implicate the concerns that were addressed in either *Ingraham* or this court's decision in *Garcia*—namely, affirmative acts of excessive or cruel punishment. Therefore, our discussion in *Hilliard* about the relationship between the state and public school students has little bearing on the question that we must decide here.

This case presents us squarely with an issue that we did not address in *Hilliard*— that is, whether a compulsory state attendance law sufficiently restrains a school child's liberty so that the state incurs, under the Due Process Clause, an affirmative duty to protect school children who attend state-run schools from deprivations by private actors. We hold that compulsory attendance laws in no way restrain a child's liberty so as to render the child and his parents unable to care for the child's basic needs. Thus, no affirmative duty arises merely on the basis of compulsory attendance laws.

The Third Circuit faced this precise issue in *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364 (3d Cir.1992) (en banc). In *Middle Bucks,* public high school students sued Pennsylvania school authorities under 42 U.S.C. § 1983 for harm suffered when they were physically, verbally, and sexually molested by several male students. The recurring assaults occurred throughout the 1989–90 school year while the students attended a graphic arts class. The plaintiffs argued that a special relationship existed between students and the school authorities during the school day because the State's compulsory education laws so restrained the children's liberty interests that they should be deemed to be in the State's custody during school hours for purposes of the Fourteenth Amendment. That special relationship, they argued, gave rise to an affirmative constitutional duty on the part of state officials to protect students from serious harm. The court held that no special relationship based upon a restraint of liberty existed, stating that "[b]y requiring D.R. to attend

assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs." *Id.* at 1372.

The court distinguished the incarceration and institutionalization cases from those involving school students because the former involve "full time severe and continuous state restriction[s] of liberty" and render the institutionalized "wholly dependant upon the state ... to meet their basic needs." *Id.* at 1371. In contrast, parents decide where their children will be educated, and public school children "remain resident in their homes [and] may turn to persons unrelated to the state for help on a daily basis." *Id.* at 1372. The court also contrasted the school student context with the foster care cases:

> A relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families. By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being. In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs. Students, on the other hand, do not depend upon the schools to provide for their basic human needs.

*Id.* (citations omitted).

The Seventh Circuit reached the same conclusion in *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267 (7th Cir. 1990). In *Alton*, parents of various students brought an action against Illinois school authorities under § 1983 for viola-tion of their children's liberty interest as a result of the alleged sexual molestation of their children by a school teacher.[4] The plaintiffs argued that "the school defendants had a 'special relationship' to the school children, imposing an affirmative duty to provide for their safety and to prevent the child abuse that occurred in this case." *Id.* at 272. The Seventh Circuit concluded that "the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises." *Id.* The Seventh Circuit based this conclusion on the fact that school children, unlike prisoners and mental patients, are able to provide for their basic human needs and that "parents still retain primary responsibility for feeding, clothing, sheltering, and caring for the child." *Id.*

After reviewing *DeShaney*, *Middle Bucks*, and *Alton*, we agree with the Third and Seventh Circuits and conclude that compulsory attendance laws do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school.[5] Under *DeShaney*, an affirmative duty to protect arises only when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005.. This type of restraint simply does not occur under New Mexico compulsory attendance laws. Although a child may well be in the "custody" of the school authorities during school hours, this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child. Compulsory attendance laws do

---

4. Despite the fact that the school teacher is a state actor, the court distinguished *Stoneking II* because the plaintiffs argued that the authorities were liable only because of their special relationship with the students, not because they established or maintained policies allowing the action to occur. *Id.* at 271–72.

5. Two recent district court opinions, relying on *Alton*, reached the same conclusion. *See Dorothy J. v. Little Rock Sch. Dist.*, 794 F.Supp. 1405 (E.D.Ark.1992) (holding that state laws regard-ing compulsory education and in loco parentis authority do not give rise to special relationship between school district and student sexually assaulted by another student); *Doe v. Douglas County Sch. Dist. RE–1*, 770 F.Supp. 591 (D.Colo.1991) (concluding that special relationship did not exist between county school district and student where school psychologist sexually molested student). *But see Waechter v. School Dist. No. 14–030*, 773 F.Supp. 1005 (W.D.Mich. 1991).

not alter the fact that parents retain ultimate responsibility for their child's food, shelter, clothing, medical care, and reasonable safety.

Further, the state does not confine school children in the same way that it confines prisoners, the institutionalized, or children in foster homes. These individuals depend completely on the state to satisfy their basic human needs; the state restrains their liberty to such an extent that it renders them unable to care for their own basic needs. School children, on the other hand, can leave school at the end of the day. The compulsory education laws do not change the fact that the parents are the primary caretakers of the students; those same parents—and not the state— must determine and address the basic needs that each child has. This amount of freedom on the part of the student and the degree of parental involvement and control necessarily dictate that the state does not become the primary caretaker simply by mandating compulsory school attendance.

Thus, we conclude that compulsory attendance laws do not impose the severe restraints on individual liberty that implicate the Due Process Clause of the Fourteenth Amendment. Although the facts of this case present a truly tragic situation, the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202, 109 S.Ct. at 1007.

■ Because appellant does not appeal the district court's grant of summary judgment in favor of defendants McGowen and Malano, we do not address whether Maldonado stated an independent basis for liability that is not controlled by *DeShaney*. *See Stoneking II*, 882 F.2d at 725 ("Liability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon the existence of a 'special relationship' between the municipal officials and the individuals harmed."). We simply conclude that Maldonado has failed to establish a constitutional deprivation with regard to the school teacher's liability.

Therefore, appellee is entitled to qualified immunity.

AFFIRMED.

SEYMOUR, Circuit Judge, concurring.

No sooner does this circuit determine that the state owes children in its custody an affirmative duty of protection, *Yvonne L. v. New Mexico Dep't of Human Servs.,* 959 F.2d 883, 893 (10th Cir.1992), than the majority here limits that duty to exclude schoolchildren. While I concur in the result reached by the majority opinion, I depart from its analysis at a critical point. Rather than conclude flatly that no affirmative duty exists in this situation, I would follow the analysis set out in *Yvonne L.,* 959 F.2d at 890–93, and hold that a child legally required to attend school and thereby forced into the temporary day-time custody of the state's agents is constitutionally entitled to some level of protection from harm and care for basic safety. I would nonetheless affirm summary judgment in defendant's favor because there is no evidence in the record that the teacher was deliberately indifferent to the danger that awaited Mark Maldonado, and thus no issue of material fact with respect to defendant's *breach* of a clear affirmative duty.

*DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), as the majority recognizes, interprets past Supreme Court precedent as holding that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. at 1005. The idea is simply that the state assumes an obligation to fulfill the "basic human needs—*e.g.,* food, clothing, shelter, medical care, and *reasonable safety*," *id.* at 200, 109 S.Ct. at 1005 (emphasis added), of those people whom the state has rendered unable to care for themselves.

In *Yvonne L.,* we followed a number of other courts in concluding that state foster care is a situation in which the state, by shouldering the responsibility to care for

children, incurs an affirmative constitutional duty to insure their reasonable safety. We held that an affirmative duty to foster children follows from the line of cases imposing such a duty on the state with respect to pretrial detainees, *see City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (duty to provide medical care), mentally disabled people in state institutions, *see Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (duty to insure reasonable safety), and prisoners, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (duty to provide medical care). We also analogized the situation of children in state foster care to that of juveniles involuntarily placed by the state in a private boarding school, *see Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983). On the basis of this line of cases and the above-quoted language from *DeShaney*, we concluded that "[i]f defendants knew of the asserted danger to plaintiffs or failed to exercise professional judgment with respect thereto, ... and if an affirmative link to the injuries plaintiffs suffered can be shown, then ... defendants violated plaintiffs' constitutional rights." *Yvonne L.*, 959 F.2d at 890.

The majority attempts to distinguish the custodial situations described in *DeShaney* and *Yvonne L.* from the facts presented here by observing that compulsory attendance laws do not "render the child and his parents unable to care for the child's basic needs." Maj. op. at 731. To reach this conclusion, the majority focuses on two circuit court decisions. In *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267 (7th Cir.1990), the Seventh Circuit concluded that a school district is not constitutionally liable for the sexual molestation of students by their teacher because compulsory attendance laws do not create "responsibility for [the students'] entire personal lives."[1] *Id.* at 272. Following a

similar rationale, the Third Circuit held that compulsory attendance laws do not create an affirmative duty to protect *high school* students from repeated sexual assaults by other students because children in school are still able to meet their own "basic needs." *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir.1992) (en banc). Both courts read *DeShaney* as finding an affirmative duty to protect only when the state has physical custody of the individual. Under this analysis, school children, as residents in their parents' homes, are not in custody of the state. Therefore, parents retain responsibility for providing for the children's basic needs, including protection during school hours. The Third Circuit further stated that, to provide this protection, parents may remove their children from public school in favor of home education or private schools. The Third Circuit also found no custodial relationship stemming from a restraint of the student's liberty since the student "could, and did, leave the school building every day. The state ... thus did not deny her meaningful access to sources of help." *Id.* at 1372.

Much of the *Middle Bucks* analysis does not support the majority's opinion here. Unlike the repeated incidents in *Middle Bucks* and *Alton*, a sole incident is the basis of Mark Maldonado's death. No warnings or previous injuries existed to alert Mark's parents or to allow Mark to "seek help." Moreover, even if such warnings had existed, the belief that alternatives to public education are easily found is misplaced. "For the vast majority of children of school age, [there] is no choice at all." *Middle Bucks*, 972 F.2d at 1380 (Sloviter, C.J., dissenting).

Beyond the stark difference in facts, the basis of the holdings in *Alton* and *Middle Bucks* is off the mark. Obviously, a parent does not lose all control over, nor all responsibility for, satisfying a child's basic needs simply as a result of school attend-

---

**1.** The suggestion in *Alton* that sexual assault is a matter of one's "personal life" is as offensive as it is bizarre. No one, to my knowledge, has contended that a school district is to be held constitutionally responsible for *all harm* that may befall a student, no matter when or where. A school or teacher may nonetheless assume an obligation to protect its students during those hours that a student is on school premises or in a classroom as required by state law.

ance laws. But younger children are incapable of providing for their own basic needs; they depend on parents or other caretakers to provide for them.[2] Even older children may be forced by school disciplinary procedures and rules to rely on authority figures at school to protect them from harm. I cannot fathom who, other than a teacher or other school staff member, is capable of ensuring the "reasonable safety" of schoolchildren during the school day and class periods.

A number of district court cases are at odds with the holdings of *Alton* and *Middle Bucks*, followed by the majority here, that public school personnel owe no constitutional duty to children in their care. In *Pagano v. Massapequa Pub. Schs.*, 714 F.Supp. 641, 643 (E.D.N.Y.1989), for example, the court held "elementary school students who are required to attend school ... to be owed *some* duty of care by [school] defendants." *Id.* at 643. Similarly, a district court more recently held that a student "was in a custodial relationship" with his teacher, who required the student to run a 350 yard sprint despite his knowledge of the student's congenital heart defect. *Waechter v. School Dist. No. 14–030*, 773 F.Supp. 1005, 1009 (W.D.Mich.1991).[3] *But see Dorothy J. v. Little Rock Sch. Dist.*, 794 F.Supp. 1405 (E.D.Ark.1992) (following *Alton*).

Although I believe the state owes a constitutional duty to provide for the reasonable safety of children required to attend school, I would nevertheless affirm the dismissal of the complaint in this case. Because the complaint does not allege that the teacher was deliberately indifferent to the potential danger to Mark Maldonado, it fails to state a breach of the teacher's duty. *See* Appellant's Appendix at 1–6. I do not believe the Constitution requires an elementary school teacher to protect her students from unknown and unforeseen harms, or to follow the minute-by-minute progress of her eleven-year-old charges. Even accepting as true the allegations that the teacher "permitt[ed] him to leave the classroom and remain in the cloakroom unsupervised for [twenty minutes]," *id.* at 3, there is nothing that suggests either the teacher's "deliberate indifference" or "failure to exercise professional judgment," *see Yvonne L.*, 959 F.2d at 893–94. Under the facts as alleged, the teacher did not breach the duty I believe the Constitution imposes.

The ground on which I concur, however, is a far cry from the majority's holding that no constitutional duty exists in any case. Under the majority's holding, children suffering all manner of injuries attributable to the knowing inaction of state officials charged with their supervision and care will be unable to pursue federal constitutional claims. We do not adequately discharge our duty to interpret the Constitution by merely describing the facts as "tragic" and invoking state tort law, *see* maj. op. at 732.[4] In my judgment, the Fourteenth Amendment requires that we recognize *some* affirmative duty on the part of public school teachers to protect students who are in the total care of the school during the period of their compulsory attendance.

---

2. Even the Third Circuit recognized the difference between younger and older school children. In discussing whether high school children are in some sort of custody of the school during school hours, the court in *Middle Bucks* stated: " '[e]xcept perhaps when very young, the child is not physically restrained from leaving school during school hours.' " *Id.* at 1372 (quoting *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977) (emphasis added).

3. Because the teacher was the direct cause of harm in *Waechter,* that case could presumably

have also been brought under the line of cases following *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). *See, e.g., Garcia v. Miera*, 817 F.2d 650 (10th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).

4. Such an abdication is particularly disingenuous when, as here, the teacher or other state actor is insulated from state liability under a state tort claims act, *see* N.M.Stat.Ann. § 41–4–4 (1989).