EDITH H. JONES, Circuit Judge:
Andrew Gaston’s last moments on earth were passed in the hallway at A. Maceo Smith High School in Dallas, Texas. He was hit in the head by a stray bullet shot during a melee instigated by the ldller, non-student Drumestic Contreal Brown. The question before this court is whether Gaston had either (1) a constitutional right not to be placed in danger of deadly violence while at school or (2) a more general constitutional right to some level of affirmative protection while at school. Despite our sympathy for Andrew’s untimely death, we find no constitutional damage remedy available to his family.
The § 1983 case[1] filed by Gaston’s father against Dallas Independent School District and Donnie Breedlove, the principal of Smith High, was dismissed for failure to state a claim. Fed.R.Civ.P. 12(b)(6). The skeletal pleadings, our only guide to the facts, reveal .few details of the incident in which Gaston died. They state that the assailant Brown somehow rode a school bus[2] to Smith High on the morning of October 23, 1991. Brown went onto campus and into the high school building although he was not wearing a student ID badge required in some of DISD’s schools. Further, Brown carried a concealed handgun, which was not discovered because the metal detectors placed by DISD at the school were not being used. Brown then created a disturbance, causing students — allegedly without the aid of school employees— to attempt to evict him. Gaston was tragically in the line of fire when Brown shot his gun.
The district court’s conscientiously reasoned dismissal rested on three pivotal elements of a § 1983 claim.[3] First, the court held, Gaston had no affirmative constitutional right to protection by DISD while he was at school. Second, because plaintiff, had not pled that DISD’s actions, custom, or policy caused Gaston’s death, DISD could not be held constitutionally liable. Third, plaintiff had not pled facts sufficient to overcome principal Breedlove’s assertion of qualified immunity. This court may affirm the dismissal for failure to state a claim only if “it appears ‘beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’ ” Haines v. Kerner, 404 U.S. 519, 520-21; 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).
The epidemic of violence in American public schools is a relatively new phenomenon, but one which has already generated considerable caselaw. Whether that epidemic in *200 vokes constitutional consequences for the innocent, law-abiding students forced to attend those schools raises grave questions that must be carefully analyzed.
To plead a constitutional claim for relief under § 1983, Gaston’s father had to allege a violation of a right secured to Andrew by the Constitution or laws of the United States and a violation of that right by one or more state actors. Against the Dallas Independent School District, he had to allege that an unconstitutional custom or policy of DISD caused the violation. See Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir.1994). In this as in other similar cases, two potential theories of constitutional liability have been proposed. First, it may be contended that DISD and Principal Breedlove “violated [Andrew’s] constitutional rights by affirmatively creating the hazardous environment” in which he attended school. Id. at 530. Alternatively, Andrew’s father asserts that the state bore Andrew an affirmative duty of care arising from the state’s compulsory attendance laws. These theories will be discussed in turn.
1. State-Created Danger
When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state “custody.” This principle has been applied in a number of cases from other circuits. Three cases exemplify the state-created danger theory of liability. In Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), a police officer arrested a drunken driver and impounded his car, leaving the female passenger alone at night, without any means to go home, in a neighborhood known for criminal activity. She was raped by a stranger who offered her a lift. In Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir.1989), cert. denied, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), the state permitted a prisoner with a violent criminal history to participate in a work program at a municipal town hall under the supervision of an untrained city employee. He gained access to a knife, abducted the plaintiff who worked for ■the city, and held her hostage for three days. Finally, in K.H. ex rel. Murphy v. Morgan, 914 F.2d 846 (7th Cir.1990), the state removed a sixteen-month-old child from her parents’ custody and in the next four years shuttled her among eleven foster homes, in at least two of which she was molested or abused. The court held that, if the allegations of the child’s complaint were correct, state officials could be guilty of knowingly subjecting her to serious psychological damage. See also White v. Rochford, 592 F.2d 381, 384-85 (7th Cir.1979) (state liable for injuries to minor children left in car on side of busy highway after state officer arrested the driver). Although different facts underlie each of these cases, the courts uniformly held that state actors may be liable if they created the plaintiffs’ peril, increased their risk of harm, or acted to render them more vulnerable to danger.[4]
In contrast to these cases, but not in conflict, stands D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3rd Cir.1992) (en banc), cert. denied, — U.S. —, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993), in which the Third Circuit held en banc that a school could not be liable for a series of sexual assaults allegedly committed against two female students in the unisex bathroom and a darkroom of the school’s graphic arts class. The abuse allegedly occurred during class, virtually under the eye of a teacher trainee, two to four times weekly for an entire semester. Unlike the preceding state-created danger cases, however, the facts in Middle Bucks did not sufficiently demonstrate that the state placed the plain *201 tiffs in danger, increased their risk of harm, or made them more vulnerable to danger. A classroom is not per se dangerous, nor can it ordinarily be expected that even an under-trained teacher will permit or be ignorant of sexual molestation going on in class. The risk that some students would sexually molest other students during a class was not found to be foreseeable to or known by school officials.[5]
The key to the state-created danger cases, and the essence of their distinction from Middle Bucks, lies in the state actors’ culpable knowledge and conduct in “affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid.” Wideman v. Shallowford Community Hospital, Inc., 826 F.2d 1030, 1035 (11th Cir.1987). See also L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992) (state officials knowingly assigned violent, habitual sex offender to work alone with female prison employee and did not inform her of the risk). Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party’s crime to occur. Put otherwise, the defendants must have been at least deliberately indifferent to the plight of the plaintiff. See Leffall, 28 F.3d at 531 (no due process claim stated against school district or officials for holding a high school dance at which a student was shot and killed).
This court recently noted that no Fifth Circuit case has yet predicated relief on a state-created danger theory, Id. at 530-31. Leffall also questioned whether the Supreme Court voiced support for that theory of constitutional liability. In DeShaney v. Winnebago County Dept. of Social Serv’s., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court remarked, “while the state may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.” 489 U.S. at 201, 109 S.Ct. at 1006 (emphasis added). Leffall suggested that the Court was simply placing in context its broader ruling that the state had no affirmative duty to the young client of its welfare department. Rather than adopt or reject a state-created danger theory, Leffall found, in the context of a fatal shooting at a school-sponsored dance, that the school officials lacked the requisite culpability for a constitutional violation.
The approach of Leffall applies in this case. Even if the state-created danger theory is constitutionally sound, the pleadings in this ease fall short of the demanding standard for constitutional liability. First, they posit the question whether the environment at Smith High School was “dangerous.” If for no other reason, the presence of numerous trained adults would assure that a school cannot be as dangerous as the nocturnal condition of the high-crime neighborhood described in Wood or the prisoner release program gone awry in Cornelius. No inference of dangerousness arises simply from the presence of student ID badges or metal detectors; such devices could have been installed prophylactically, in the absence of any prior trespasses onto campus or incidents of criminal violence. Moreover, to infer the existence of a dangerous environment — the condition of § 1983 liability — solely from the presence of measures designed to avert violence would erect a serious disincentive to their use. The law cannot so turn against its purposes; the use of security devices should be encouraged, not discouraged. There would have to be allegations at least of previous criminal conduct at Smith High School from which a trier of fact could conclude it was tantamount to a “high-crime area.”
Second, school officials must have actually known that Smith High was dangerous to students such as Andrew Gaston. Actual knowledge of a serious risk of physical danger to the plaintiff has been a common feature of the state-created danger cases. From the pleadings in this case, no legiti *202 mate inference can be drawn that school officials might have been actually aware of a high risk that an armed non-student invader would enter the campus and fire a pistol randomly during school hours.
Appellant’s claim also fails the third element of the state-created danger cases. There is no pleading that school officials placed Gaston in a dangerous environment stripped of means to defend himself and cut off from sources of aid. There is no sufficiently culpable affirmative conduct. Andrew went to school. No state actor placed Andrew in a “unique, confrontational encounter” with a violent criminal. Cornelius, 880 F.2d at 359. No official in the performance of her duties abandoned him in a crack house or released a known criminal in front of his locker. There is no suggestion that the school district or principal fostered or tolerated anarchy at Smith High — the ID badges and metal detectors permit the opposite inference. Even if the deployment of such security measures was haphazard or negligent, it may not be inferred that the conduct of the defendants rose to the level of deliberate indifference. As in Leffall, the most that may be said of defendants’ ultimately ineffective attempts to secure the environment is that they were negligent, but not that they were deliberately indifferent. See also Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d 991, 995 (10th Cir.1994); compare Salas v. Carpenter, 980 F.2d 299 (5th Cir.1992). On the contrary, the facts here pleaded suggest only that Andrew was the tragic victim of random criminal conduct rather than of school officials’ deliberate, callous decisions to interpose him in the midst of a criminally dangerous environment. Appellant’s complaint, in short, does not suffice to plead that Andrew was the victim of state-created danger.
2. Constitutional “Special Relationship”
Although Gaston’s death was not a result of an unconstitutional state-created danger, this does not necessarily preclude the broader theory of liability, premised on DeShaney, if a “special relationship” exists between the plaintiff and the state. In that case, the Supreme Court held that a minor could not maintain a § 1983 action against Winnebago County and its social services department or employees for serious injuries inflicted by his father after a county caseworker returned DeShaney to his father’s custody and allegedly knew or should have known that the father would be violent. The Court concluded that “a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.” DeShaney, 489 U.S. at 197, 109 S.Ct. at 1004. The Court rejected the contention that a “special relationship,” carrying affirmative constitutional obligations toward the child, existed by virtue of the social welfare services the state provided. Such affirmative obligations of care and protection arise only when the state “takes a person into its custody and holds him there against his will.” Id. at 199-200,109 S.Ct. at 1005-06 (citing Youngberg v. Romeo, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (institutionalized mentally ill) and Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (prisoners)). The district court here concluded, as has every circuit court that has considered the issue, that DeShaney forecloses a constitutional claim on behalf of Andrew Gaston for affirmative protection while at school. See, e.g., Maldonado v. Josey, 975 F.2d 727, 730-33 (10th Cir.1992), cert. denied, - U.S. -, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); Dorothy J. v. Little Rock Sch. Dist. 7 F.3d 729, 732 (8th Cir.1993); D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1369-72 (3rd Cir.1992) (en banc), cert. denied, — U.S. —, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); J.O. v. Alton Community Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir.1990).
Our court recently declined to address whether a “special relationship” imposes affirmative constitutional duties of care on public schools. Doe v. Taylor ISD, 15 F.3d 443, 451 n. 3 (5th Cir.1994) (en banc); Leffall, 28 F.3d at 528-29.[6]
*203 As in Doe and Leffall, we find it unnecessary to decide the “special relationship” issue in this ease. We agree with the district court’s conclusion on somewhat different grounds than it expressed. While a persuasive argument can be made for applying a DeShaney “special relationship” in some measure to public school students who are forced by compulsory education laws to attend school and have no choice among public schools[7], even under such a legal regime the appellant’s claim would not succeed. Andrew Gaston’s death is attributable to the fortuity that an armed, violent non-student trespassed on campus. There can be no liability of state actors for this random criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety — a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a “special relationship” with the state. See, e.g., Farmer v. Brennan, — U.S. —, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
*204 Because of our conclusion that appellant stated no § 1983 claim, we need not consider the specific grounds for potential liability of the principal or Dallas Independent School District or the question of qualified immunity-
For the foregoing reasons, the judgment of the district court is AFFIRMED.

. State law causes of action were also pled in the complaint, but they were dismissed on the basis that Texas law indisputably shields school districts and their employees from this kind of liability. The complaint did not assert any claim founded on the Texas constitution.

. DISD is quick to point out that it did not run the school bus — that service was contracted out to a private company.

. This opinion discusses only the § 1983 claim because the district court ruled correctly on the other issues asserted by appellant.

. Compare Salas v. Carpenter, 980 F.2d 299 (5th Cir.1992); Bryson v. City of Edmond, 905 F.2d 1386, 1392 (10th Cir.1990) (No liability of state for deaths of post office employees shot by fellow employee where responding police officers did not create the dangerous situation or worsen decedents' plights); Jackson v. City of Joliet, 715 F.2d 1200, 1206 (7th Cir.1983), cert. denied, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984) (police conduct was held not the cause of the plaintiffs' injuries when officer did not know that there were occupants in a burning car and did not render aid); Brown v. Grabowski, 922 F.2d 1097 (3d Cir.1990).

. And while the Middle Bucks decision does not articulate this point, it seems self-evident that the plaintiffs could have complained to their teacher or their parents, but their pleadings did not indicate that they attempted such means of self-defense.

. In Walton v. Alexander, 20 F.3d 1350 (5th Cir.1994), this court held that a "special relationship” was created between the supervisor of a Mississippi custodial school for deaf children and *203 one of the students. The panel opinion has been vacated by the grant of rehearing en banc. See Fifth Circuit Internal Operating Procedure associated with F.R.A.P. 35. Additionally, for the reasons stated in Leffall, Walton is distinguishable.

. It is Texas law that, with few exceptions, students are required to attend school until they reach the age of 17. See Tex.Educ.Code Ann. § 21.032 (Vemon 1987 & Supp.1993). See also Tex.Educ.Code Ann. § 21.033 (exemptions from compulsory attendance requirements). Further, Texas law requires students usually to attend the public school, often a neighborhood school, designated by the district. See Tex.Educ.Code Ann. § 21.032(a) (Vernon Supp.1993). State law places the school in loco parentis during ordinary school hours and during the conduct of certain school activities. See, e.g., Mercer v. State, 450 S.W.2d 715 (Tex.Civ.App.—Austin 1970, error dism'd as moot). Notwithstanding similar laws in other states, four courts of appeals have held that a student is not "in custody” within DeSha-ney. These courts reason that custody in DeSha-ney meant such an involuntary, full-time physical restraint and superintendence as prevents a person from otherwise independently providing for his needs and safety. See Dorothy I. v. Little Rock Sch. Dist., 7 F.3d 729 (8th Cir.1993); Maldonado v. Josey, 975 F.2d 727, 731 (10th Cir.1992); D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d at 1370-72; J.O. v. Alton Community Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir.1990). Public school attendance is deemed “voluntary” because parents are permitted to withdraw their students from the public schools. Further, parents remain the principal caretakers of their children even though they are housed at school for at least six to eight hours daily.
The fact is, however, that the state’s custody of children in public schools is more comprehensive than is its intervention in family affairs via noncustodial welfare services. Such services often involve sporadic, intermittent contact with clients on a schedule that may not be predictable. Social workers provide valuable services to their un-institutionalized clients, but they cannot and do not tend to them continuously nor do they necessarily rely upon state-managed facilities as the locus of care. Schools, however, take care of children day after day for years in public facilities. Schools may be said to control children's environments to the same or even greater degree than state-sponsored foster care services, which have been held, post-DeShaney, to bear affirmative obligations to their client children. See, e.g., K.H. v. Morgan, supra; Yvonne L. v. New Mexico Dept. of Human Servs., 959 F.2d 883, 893 (10th Cir.1992).
The argument against holding that public schools have "custody,” at least for some purposes of protecting their physical well-being, appears to derive less from logic than from a pragmatic desire to limit their legal liability. As has been shown, students must attend school and may not leave without permission. To say that student attendance is voluntary because parents may elect to home-school their children or send them to a private school is lamentably, for most parents, a myth. See D.R. v. Middle Bucks, 972 F.2d at 1380 (Sloviter, J., dissenting). To intimate that parents retain effective responsibility for their children's well-being when the school alone makes critical decisions regarding student safely and discipline is inaccurate. To suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous. That parents yield so much of their children’s care into the hands of public school officials may well be argued to place upon the officials an obligation to protect students at least from certain kinds of foreseeably dangerous harm during regular school hours.
The author of this opinion dissented in Doe v. Taylor LSD, 15 F.3d 443 (5th Cir.1994) (en banc). In suggesting that the "special relationship” theory of DeShaney may logically apply to public schools governed by compulsory attendance laws, I do not retreat from my reticence to expand the scope of constitutional claims, yet I feel compelled to observe the deficiencies of governing circuit caselaw.