# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2011

_____

| | | |
|---|---|---|
| Sharon Lee, Individually and as | * | |
| Administratrix of the estate of | * | |
| Courtney Fisher, Deceased, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Pine Bluff School District; | * | |
| Darrell McField, Individually and as | * | |
| agent and employee of the Pine Bluff | * | |
| School District, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: September 27, 2006
Filed: January 8, 2007

_____

Before WOLLMAN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Sharon Lee appeals the decision of the district court dismissing her lawsuit against the Pine Bluff School District and Darrell McField, an employee of the school district. We affirm.

I.

This case involves the tragic death of Courtney Fisher, Lee's son and a former student in the Pine Bluff School District. According to Lee's complaint, in January 2004, Courtney was an eighth-grade student at Jack Robey Junior High School in Pine Bluff, and a member of the school band. McField was the director of the band, and he supervised band activities and trips.

The complaint alleges that the band and its members were invited to participate in a competition in Atlanta, Georgia, on or about January 16-20, 2004, and Lee permitted Courtney to make the trip to Atlanta. Lee completed a "medical form," which listed Courtney's grandmother as an "emergency contact person," and which also provided a name and telephone number for the family doctor, and a health insurance policy number. Lee checked a box stating that Courtney had no physical problems that would prohibit exercise, and then signed her name to a statement that "I give my consent to the band director to secure treatment at the best medical facility available if an injury does occur." The complaint alleged that because parents and teachers were chaperones on the tour, Lee was confident that Courtney would be provided "reasonable care and supervision," and that Courtney's grandmother would be contacted immediately "in the event an emergency occurred and Courtney became ill or injured."

According to the complaint, Courtney became ill on Saturday, January 17, after arriving in Atlanta. McField held Courtney out of the band competition on that date due to the severity of the symptoms, and "for the duration of the trip, Courtney was confined to a bed in his hotel room, making occasional trips to the bathroom to vomit." The complaint asserts that Courtney could not eat, and that his only source of sustenance was juice and water. Lee alleges that although the adults recognized that Courtney was extremely ill, and did not allow him to participate in functions or

sightseeing excursions, they failed to seek medical attention, and did not notify his family or physician of the illness.

The complaint alleges that when the band returned home in the early morning of January 20, Lee drove Courtney directly to a regional medical center, where medical personnel determined that he should be transported to a children's hospital in Little Rock. Courtney suffered cardiac arrest upon his admission to the hospital, and he died on January 21. The death was attributed to undiagnosed diabetes. Lee's complaint alleges that Courtney's death could have been prevented if the chaperones, including McField, had sought medical care for Courtney.

Lee brought several state-law claims of negligence against McField and the school district, and also included an allegation, read generously, that the Pine Bluff School District and McField are liable under 42 U.S.C. § 1983 for violating Courtney's constitutional rights. The constitutional claim asserted that based on the consent form signed by Lee, McField and other representatives of the school district assumed "care, custody, and control" of Courtney, and had a corresponding duty to care for his medical needs. The complaint asserts that these state officials were "deliberately indifferent" to Courtney's medical needs, and "willfully and deliberately" failed to provide adequate care. Lee alleges that the inaction of these state actors would "shock the consc[ience]" of the court.

The district court[1] dismissed the constitutional claim with prejudice, holding that "to assume federal jurisdiction over this case would require the Court to disregard the admonition in *Dorothy J.* [*v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir. 1993)], that common law torts should not be converted into constitutional violations merely because the actor was employed by a subdivision of the state." The court declined to

---

[1]The Honorable J. Leon Holmes, Chief United States District Judge for the Eastern District of Arkansas.

exercise supplemental jurisdiction over the remaining state-law claims and dismissed them without prejudice. We review the district court's decision *de novo*, recognizing that a complaint is properly dismissed "if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001).

## II.

The Due Process Clause of the Fourteenth Amendment is not a "font of tort law." *Paul v. Davis*, 424 U.S. 693, 701 (1976). The Supreme Court has written that neither the text nor the history of the Clause supports the proposition that the State must "guarantee certain minimal levels of safety and security." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195-96 (1989). The Due Process Clause is principally a restraint on the power of government to act, and it "generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

In "certain limited circumstances," however, when the State restrains an individual's liberty "through incarceration, institutionalization, or other similar restraint," the Constitution does impose a corresponding duty on the State "to assume some responsibility for [the individual's] safety and general well-being," because the State has rendered the person unable to care for himself. *Id.* at 198-200. The substantive component of the Due Process Clause, for example, requires a State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety," *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982), and to provide suspects in police custody with medical care required by injuries suffered during their apprehension. *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

-4-

The district court dismissed Lee's constitutional claim against the Pine Bluff School District without delving into these principles, because the complaint alleged no policy or custom of the district that caused an alleged constitutional violation. We agree with this conclusion. It is well settled that a municipality may not be found liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). A school district cannot be held liable under § 1983 on a *respondeat superior* theory, *i.e.*, simply because it employs a tortfeasor. *Id.* at 691. Lee's complaint alleged no unconstitutional policy of the Pine Bluff School District, and it asserted no widespread unconstitutional practices that might constitute a "custom or usage with the force of law." *See McMillian v. Monroe County*, 520 U.S. 781, 796 (1997) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)). Accordingly, the district court properly dismissed Lee's constitutional claim against the school district.

Whether McField, the band director, may be liable under § 1983 does require consideration of whether the complaint identifies one of the "limited circumstances" in which a state official may have a constitutional duty to attend to the medical needs of a citizen. As noted, *DeShaney* defined those circumstances as situations in which the State restrains an individual's liberty "through incarceration, institutionalization, or other similar restraint." 489 U.S. at 200. We conclude that the scenario alleged here does not meet the stringent requirements for substantive due process liability.

We previously have considered whether compulsory attendance at public schools places a student within the limited category of individuals to whom the State owes a special duty of care. In *Dorothy J.*, we joined three other circuits in holding that "state-mandated school attendance does not entail so restrictive a custodial relationship as to impose upon the State the same duty to protect it owes to prison inmates, or to the involuntarily institutionalized." 7 F.3d at 732 (internal citation omitted). In *Dorothy J.*, therefore, we held that school officials did not have a

-5-

constitutional duty to protect a mentally retarded student from violent acts of another student. *See also*, *e.g.*, *Maldonado v. Josey*, 975 F.2d 727, 731-33 (10th Cir. 1992) (holding that a public school teacher had no constitutional duty to supervise a fifth grade student who, left unsupervised in cloakroom, became caught on his bandana and died of strangulation). Not long after *Dorothy J.*, the Supreme Court indicated agreement with our holding, saying "we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a 'duty to protect.'" *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655 (1995). *Cf. Hasenfus v. LaJenuesse*, 175 F.3d 68, 72 (1st Cir. 1999) (reserving whether schools may have a "specific" duty of care in certain "narrow circumstances").

Given that even mandatory school attendance generally does not give rise to a constitutional duty of care that could trigger liability based on substantive due process, it is not surprising that the weight of authority also holds that school officials have no such duty with respect to students participating in *voluntary* school-related activities that are *not* required by state law. For if a citizen voluntarily exercises his liberty to enter into the custody of a state official or to participate in a state-sponsored activity, it is difficult to conclude that *the State* has deprived the citizen of liberty. *See Zinermon v. Burch*, 494 U.S. 113, 117 n.3 (1990) ("If only those patients who are competent to consent to admission are allowed to sign themselves in as 'voluntary' patients, then they would not be deprived of any liberty interest at all."); *Torisky v. Schweiker*, 446 F.3d 438, 446 (3d Cir. 2006) ("[A] custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger the [substantive due process] protections of *Youngberg*."); *cf. Parham v. J.R.*, 442 U.S. 584, 604 (1979) (holding that parents retain a substantial, if not the dominant, role in the decision to commit a child voluntarily to a state mental hospital, absent a finding of neglect or abuse).

In the educational context, for example, the Fifth Circuit determined that no "special relationship" existed between a public school district and its students during

a school-sponsored dance held outside of the time during which students were required to attend school for non-voluntary activities. *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 529 (5th Cir. 1994). That court also held that a student attending a residential school for the deaf was not "within the narrow class of persons who are entitled to claim from the state a constitutional duty of protection from harm," because the student "attended the school voluntarily with the option of leaving at will, an option that was never withdrawn." *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc). In a case that bears some factual similarity to ours, the Sixth Circuit concluded that where no state law or rule required students to travel to school by bus, a school district had no special relationship with a student who was riding home on a bus, and the district thus had no constitutional duty to administer medical care when the student collapsed due to heart failure. *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995). *See also Stevens v. Umsted*, 131 F.3d 697, 703 (7th Cir. 1997) (school superintendent had no constitutional duty to protect student at state school for students with disabilities where student was voluntarily admitted with signed consent of his parents, and parent and guardian could have requested student's discharge at any time.).

Applying the principles articulated in *DeShaney* and *Dorothy J.*, we hold that Courtney likewise was not within the limited class of persons to whom the State owes a constitutional duty to provide some degree of medical care. The complaint makes no allegation that the band trip was compulsory and, indeed, acknowledges that Courtney's mother voluntarily consented to the student's participation. There is no assertion that Courtney was prohibited from leaving the band activity at any time if, for example, his mother or grandmother arranged for him to be picked up in Atlanta. Lee does not allege that McField or any chaperone denied Courtney an opportunity to contact his mother or grandmother by telephone, or that anyone prevented Courtney's family from communicating with him at the hotel during the four-day excursion. There is no claim that Courtney's voluntary participation evolved into an

-7-

involuntary commitment during the course of the trip.  *Cf. Kennedy v. Schafer*, 71 F.3d 292, 294-95 (8th Cir. 1995).

We acknowledge Lee's allegations that she was confident, based on her completion of the medical form and the presence of adult chaperones, that the school district would provide Courtney with reasonable care and supervision, and that McField was well aware that Courtney became ill during the stay in Atlanta.  In a common-law tort action, these factors might well support Lee's claim that McField was negligent.  *DeShaney* makes clear, however, that the State's *constitutional* duty to protect or care for an individual "arises *not* from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  489 U.S. at 200 (emphasis added).  As with compulsory public school attendance in *Dorothy J.*, we cannot say that voluntary participation in an out-of-town extracurricular activity is analogous to confinement in a prison or mental institution, such that the Constitution imposes on state officials an affirmative duty to care for individuals who are participating in the event.

*DeShaney* recognized that in tragic cases like this one, "judges and lawyers, like other humans," are moved by natural sympathy to try to compensate a mother for her loss, *id*. at 202, but that the Fourteenth Amendment was not designed to provide relief in all cases where the State's functionaries fail to take action that might have averted a serious harm.  The constitutional duties derived from substantive due process analysis are carefully circumscribed, and the events alleged here do not implicate the limited circumstances in which the Constitution obligates a State to care for an individual's medical needs.  The State of Arkansas, of course, may fashion a system of tort liability that would hold school officials accountable for negligence or deliberate indifference leading to the death of a student on a school-sponsored trip.  The parties have disputed whether a cause of action against school officials is

available under Arkansas law on the facts of this case, and that claim remains available for Lee to pursue in the Arkansas courts.

For the foregoing reasons, the judgment of the district court is affirmed.

_____