United States Court of Appeals,

Fifth Circuit.

No. 93-1214.

Andrew JOHNSON, Individually and as heir to and/or personal representative of the estate of Andrew Gaston, his deceased son, Plaintiff-Appellant,

v.

DALLAS INDEPENDENT SCHOOL DISTRICT and Donnie Breedlove, Defendants-Appellees.

Nov. 17, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG, JONES and DUHÉ, Circuit Judges:

EDITH H. JONES, Circuit Judge:

Andrew Gaston's last moments on earth were passed in the hallway at A. Maceo Smith High School in Dallas, Texas. He was hit in the head by a stray bullet shot during a melee instigated by the killer, non-student Drumestic Contreal Brown. The question before this court is whether Gaston had either (1) a constitutional right not to be placed in danger of deadly violence while at school or (2) a more general constitutional right to some level of affirmative protection while at school. Despite our sympathy for Andrew's untimely death, we find no constitutional damage remedy available to his family.

The § 1983 case[1] filed by Gaston's father against Dallas

---

[1] State law causes of action were also pled in the complaint, but they were dismissed on the basis that Texas law indisputably shields school districts and their employees from this kind of liability. The complaint did not assert any claim founded on the Texas constitution.

Independent School District and Donnie Breedlove, the principal of Smith High, was dismissed for failure to state a claim. Fed.R.Civ.P. 12(b)(6). The skeletal pleadings, our only guide to the facts, reveal few details of the incident in which Gaston died. They state that the assailant Brown somehow rode a school bus[2] to Smith High on the morning of October 23, 1991. Brown went onto campus and into the high school building although he was not wearing a student ID badge required in some of DISD's schools. Further, Brown carried a concealed handgun, which was not discovered because the metal detectors placed by DISD at the school were not being used. Brown then created a disturbance, causing students—allegedly without the aid of school employees—to attempt to evict him. Gaston was tragically in the line of fire when Brown shot his gun.

The district court's conscientiously reasoned dismissal rested on three pivotal elements of a § 1983 claim.[3] First, the court held, Gaston had no affirmative constitutional right to protection by DISD while he was at school. Second, because plaintiff had not pled that DISD's actions, custom, or policy caused Gaston's death, DISD could not be held constitutionally liable. Third, plaintiff had not pled facts sufficient to overcome principal Breedlove's assertion of qualified immunity. This court may affirm the

_____

[2]DISD is quick to point out that it did not run the school bus—that service was contracted out to a private company.

[3]This opinion discusses only the § 1983 claim because the district court ruled correctly on the other issues asserted by appellant.

dismissal for failure to state a claim only if "it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Haines v. Kerner,* 404 U.S. 519, 520-21; 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

The epidemic of violence in American public schools is a relatively new phenomenon, but one which has already generated considerable caselaw. Whether that epidemic invokes constitutional consequences for the innocent, law-abiding students forced to attend those schools raises grave questions that must be carefully analyzed.

To plead a constitutional claim for relief under § 1983, Gaston's father had to allege a violation of a right secured to Andrew by the Constitution or laws of the United States and a violation of that right by one or more state actors. Against the Dallas Independent School District, he had to allege that an unconstitutional custom or policy of DISD caused the violation. *See Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994). In this as in other similar cases, two potential theories of constitutional liability have been proposed. First, it may be contended that DISD and Principal Breedlove "violated [Andrew's] constitutional rights by affirmatively creating the hazardous environment" in which he attended school. *Id.* at 530. Alternatively, Andrew's father asserts that the state bore Andrew an affirmative duty of care arising from the state's compulsory

3

attendance laws.  These theories will be discussed in turn.

## 1. *State-Created Danger*

When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state "custody." This principle has been applied in a number of cases from other circuits.  Three cases exemplify the state-created danger theory of liability.   In *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), a police officer arrested a drunken driver and impounded his car, leaving the female passenger alone at night, without any means to go home, in a neighborhood known for criminal activity.  She was raped by a stranger who offered her a lift.  In *Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), the state permitted a prisoner with a violent criminal history to participate in a work program at a municipal town hall under the supervision of an untrained city employee.  He gained access to a knife, abducted the plaintiff who worked for the city, and held her hostage for three days.  Finally, in *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990), the state removed a sixteen-month-old child from her parents' custody and in the next four years shuttled her among eleven foster homes, in at least two of which she was molested or abused.  The court held that, if the allegations of the child's complaint were correct, state officials could be guilty of

knowingly subjecting her to serious psychological damage. *See also White v. Rochford,* 592 F.2d 381, 384-85 (7th Cir.1979) (state liable for injuries to minor children left in car on side of busy highway after state officer arrested the driver). Although different facts underlie each of these cases, the courts uniformly held that state actors may be liable if they created the plaintiffs' peril, increased their risk of harm, or acted to render them more vulnerable to danger.[4]

In contrast to these cases, but not in conflict, stands *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3rd Cir.1992) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993), in which the Third Circuit held *en banc* that a school could not be liable for a series of sexual assaults allegedly committed against two female students in the unisex bathroom and a darkroom of the school's graphic arts class. The abuse allegedly occurred during class, virtually under the eye of a teacher trainee, two to four times weekly for an entire semester. Unlike the preceding state-created danger cases, however, the facts in *Middle Bucks* did not sufficiently demonstrate that the state placed the plaintiffs in danger, increased their

---

[4]*Compare Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992); *Bryson v. City of Edmond,* 905 F.2d 1386, 1392 (10th Cir.1990) (No liability of state for deaths of post office employees shot by fellow employee where responding police officers did not create the dangerous situation or worsen decedents' plights); *Jackson v. City of Joliet,* 715 F.2d 1200, 1206 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984) (police conduct was held not the cause of the plaintiffs' injuries when officer did not know that there were occupants in a burning car and did not render aid); *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir.1990).

5

risk of harm, or made them more vulnerable to danger. A classroom is not per se dangerous, nor can it ordinarily be expected that even an undertrained teacher will permit or be ignorant of sexual molestation going on in class. The risk that some students would sexually molest other students during a class was not found to be foreseeable to or known by school officials.[5]

The key to the state-created danger cases, and the essence of their distinction from *Middle Bucks,* lies in the state actors' culpable knowledge and conduct in "affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Wideman v. Shallowford Community Hospital, Inc.,* 826 F.2d 1030, 1035 (11th Cir.1987). *See also L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992) (state officials knowingly assigned violent, habitual sex offender to work alone with female prison employee and did not inform her of the risk). Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur. Put otherwise, the defendants must have been at least deliberately indifferent to the plight of the plaintiff. *See Leffall,* 28 F.3d at 531 (no due process claim stated against school district or officials for

---

[5]And while the *Middle Bucks* decision does not articulate this point, it seems self-evident that the plaintiffs could have complained to their teacher or their parents, but their pleadings did not indicate that they attempted such means of self-defense.

holding a high school dance at which a student was shot and killed).

This court recently noted that no Fifth Circuit case has yet predicated relief on a state-created danger theory, *Id.* at 530-31. *Leffall* also questioned whether the Supreme Court voiced support for that theory of constitutional liability. In *DeShaney v. Winnebago County Dept. of Social Serv's.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court remarked, "while the state may have been aware of the dangers that Joshua faced in the free world, it *played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" 489 U.S. at 201, 109 S.Ct. at 1006 (emphasis added). *Leffall* suggested that the Court was simply placing in context its broader ruling that the state had no affirmative duty to the young client of its welfare department. Rather than adopt or reject a state-created danger theory, *Leffall* found, in the context of a fatal shooting at a school-sponsored dance, that the school officials lacked the requisite culpability for a constitutional violation.

The approach of *Leffall* applies in this case. Even if the state-created danger theory is constitutionally sound, the pleadings in this case fall short of the demanding standard for constitutional liability. First, they posit the question whether the environment at Smith High School was "dangerous." If for no other reason, the presence of numerous trained adults would assure that a school cannot be as dangerous as the nocturnal condition of the high-crime neighborhood described in *Wood* or the prisoner

7

release program gone awry in *Cornelius.* No inference of dangerousness arises simply from the presence of student ID badges or metal detectors; such devices could have been installed prophylactically, in the absence of any prior trespasses onto campus or incidents of criminal violence. Moreover, to infer the existence of a dangerous environment—the condition of § 1983 liability—solely from the presence of measures designed to avert violence would erect a serious disincentive to their use. The law cannot so turn against its purposes; the use of security devices should be encouraged, not discouraged. There would have to allegations at least of previous criminal conduct at Smith High School from which a trier of fact could conclude it was tantamount to a "high-crime area."

Second, school officials must have actually known that Smith High was dangerous to students such as Andrew Gaston. Actual knowledge of a serious risk of physical danger to the plaintiff has been a common feature of the state-created danger cases. From the pleadings in this case, no legitimate inference can be drawn that school officials might have been actually aware of a high risk that an armed *non-student* invader would enter the campus and fire a pistol randomly during school hours.

Appellant's claim also fails the third element of the state-created danger cases. There is no pleading that school officials placed Gaston in a dangerous environment stripped of means to defend himself and cut off from sources of aid. There is no sufficiently culpable affirmative conduct. Andrew went to

8

school.  No state actor placed Andrew in a "unique, confrontational encounter" with a violent criminal.  *Cornelius,* 880 F.2d at 359. No official in the performance of her duties abandoned him in a crack house or released a known criminal in front of his locker. There is no suggestion that the school district or principal fostered or tolerated anarchy at Smith High—the ID badges and metal detectors permit the opposite inference.  Even if the deployment of such security measures was haphazard or negligent, it may not be inferred that the conduct of the defendants rose to the level of deliberate indifference.  As in *Leffall,* the most that may be said of defendants' ultimately ineffective attempts to secure the environment is that they were negligent, but not that they were deliberately indifferent.  *See also Graham v. Indep. Sch. Dist. No. I-89,* 22 F.3d 991, 995 (10th Cir.1994); *compare Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992).  On the contrary, the facts here pleaded suggest only that Andrew was the tragic victim of random criminal conduct rather than of school officials' deliberate, callous decisions to interpose him in the midst of a criminally dangerous environment. Appellant's complaint, in short, does not suffice to plead that Andrew was the victim of state-created danger.

2. *Constitutional "Special Relationship"*

Although Gaston's death was not a result of an unconstitutional state-created danger, this does not necessarily preclude the broader theory of liability, premised on *DeShaney,* if a "special relationship" exists between the plaintiff and the

9

state. In that case, the Supreme Court held that a minor could not maintain a § 1983 action against Winnebago County and its social services department or employees for serious injuries inflicted by his father after a county caseworker returned DeShaney to his father's custody and allegedly knew or should have known that the father would be violent. The Court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney,* 489 U.S. at 197, 109 S.Ct. at 1004. The Court rejected the contention that a "special relationship," carrying affirmative constitutional obligations toward the child, existed by virtue of the social welfare services the state provided. Such affirmative obligations of care and protection arise only when the state "takes a person into its custody and holds him there against his will." *Id.* at 199-200, 109 S.Ct. at 1005-06 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (institutionalized mentally ill) and *Estelle v. Gamble,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (prisoners)). The district court here concluded, as has every circuit court that has considered the issue, that *DeShaney* forecloses a constitutional claim on behalf of Andrew Gaston for affirmative protection while at school. *See, e.g., Maldonado v. Josey,* 975 F.2d 727, 730-33 (10th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *Dorothy J. v. Little Rock Sch. Dist.* 7 F.3d 729, 732 (8th Cir.1993); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1369-72 (3rd

10

Cir.1992) (en banc), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990).

Our court recently declined to address whether a "special relationship" imposes affirmative constitutional duties of care on public schools. *Doe v. Taylor ISD,* 15 F.3d 443, 451 n. 3 (5th Cir.1994) (*en banc* ); *Leffall,* 28 F.3d at 528-29.[6]

As in *Doe* and *Leffall,* we find it unnecessary to decide the "special relationship" issue in this case. We agree with the district court's conclusion on somewhat different grounds than it expressed. While a persuasive argument can be made for applying a *DeShaney* "special relationship" in some measure to public school students who are forced by compulsory education laws to attend school and have no choice among public schools[7], even under such a

---

[6]In *Walton v. Alexander,* 20 F.3d 1350 (5th Cir.1994), this court held that a "special relationship" was created between the supervisor of a Mississippi custodial school for deaf children and one of the students. The panel opinion has been vacated by the grant of rehearing *en banc. See* Fifth Circuit Internal Operating Procedure associated with F.R.A.P. 35. Additionally, for the reasons stated in *Leffall, Walton* is distinguishable.

[7]It is Texas law that, with few exceptions, students are required to attend school until they reach the age of 17. *See* Tex.Educ.Code Ann. § 21.032 (Vernon 1987 & Supp.1993). *See also* Tex.Educ.Code Ann. § 21.033 (exemptions from compulsory attendance requirements). Further, Texas law requires students usually to attend the public school, often a neighborhood school, designated by the district. *See* Tex.Educ.Code Ann. § 21.032(a) (Vernon Supp.1993). State law places the school *in loco parentis* during ordinary school hours and during the conduct of certain school activities. *See, e.g., Mercer v. State,* 450 S.W.2d 715 (Tex.Civ.App.—Austin 1970, error dism'd as moot). Notwithstanding similar laws in other states, four courts of appeals have held that a student is not "in custody" within *DeShaney.* These courts reason that custody in *DeShaney* meant such an involuntary, full-time physical restraint and

11

superintendence as prevents a person from otherwise independently providing for his needs and safety. *See Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729 (8th Cir.1993); *Maldonado v. Josey,* 975 F.2d 727, 731 (10th Cir.1992); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1370-72 (3d Cir.1992); *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990). Public school attendance is deemed "voluntary" because parents are permitted to withdraw their students from the public schools. Further, parents remain the principal caretakers of their children even though they are housed at school for at least six to eight hours daily.

The fact is, however, that the state's custody of children in public schools is more comprehensive than is its intervention in family affairs via noncustodial welfare services. Such services often involve sporadic, intermittent contact with clients on a schedule that may not be predictable. Social workers provide valuable services to their un-institutionalized clients, but they cannot and do not tend to them continuously nor do they necessarily rely upon state-managed facilities as the locus of care. Schools, however, take care of children day after day for years *in public facilities.* Schools may be said to control children's environments to the same or even greater degree than state-sponsored foster care services, which have been held, post-*DeShaney,* to bear affirmative obligations to their client children. *See, e.g., K.H. v. Morgan, supra; Yvonne L. v. New Mexico Dept. of Human Servs.,* 959 F.2d 883, 893 (10th Cir.1992).

The argument against holding that public schools have "custody," at least for some purposes of protecting their physical well-being, appears to derive less from logic than from a pragmatic desire to limit their legal liability. As has been shown, students must attend school and may not leave without permission. To say that student attendance is voluntary because parents may elect to home-school their children or send them to a private school is lamentably, for most parents, a myth. *See D.R. v. Middle Bucks,* 972 F.2d at 1380 (Sloviter, J., dissenting). To intimate that parents retain effective responsibility for their children's well-being when the school alone makes critical decisions regarding student safety and discipline is inaccurate. To suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous. That parents yield so much of their children's care into the hands of public

12

legal regime the appellant's claim would not succeed. Andrew Gaston's death is attributable to the fortuity that an armed, violent *non-student* trespassed on campus. There can be no liability of state actors for this random criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety—a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a "special relationship" with the state. *See, e.g., Farmer v. Brennan,* --- U.S. ----, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Because of our conclusion that appellant stated no § 1983 claim, we need not consider the specific grounds for potential liability of the principal or Dallas Independent School District or the question of qualified immunity.

For the foregoing reasons, the judgment of the district court is *AFFIRMED.*

GOLDBERG, Circuit Judge, dissenting:

The majority in the case before us found that a school district should not be held responsible for the reasonable safety

---

school officials may well be argued to place upon the officials an obligation to protect students at least from certain kinds of foreseeably dangerous harm during regular school hours.

The author of this opinion dissented in *Doe v. Taylor ISD,* 15 F.3d 443 (5th Cir.1994) (*en banc* ). In suggesting that the "special relationship" theory of *DeShaney* may logically apply to public schools governed by compulsory attendance laws, I do not retreat from my reticence to expand the scope of constitutional claims, yet I feel compelled to observe the deficiencies of governing circuit caselaw.

13

of its students.  The majority opinion holds that a student cannot recover from a public school, or school officials, for injuries sustained during school hours.  I respectfully dissent.

The district court dismissed this action for failure to state a claim according to Federal Rule of Civil Procedure 12(b)(6).  Dismissal is inappropriate unless the reviewing court determines that the plaintiff could not recover under any set of facts. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957);  *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 523 (5th Cir.1994);  *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 847 (7th Cir.1990).  For purposes of this review, the court should assume that the facts alleged in the plaintiff's pleadings are true.  *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994).

The limited pleadings in this case sketch a rough image of the "transformation of our public schools from institutions of learning into crucibles of disaffection marred by increasing violence from which anguish and despair are often brought to homes across the nation." *Graham v. Indep. Sch. Dist. No. I-89,* 22 F.3d 991 (10th Cir.1994).  Andrew Gaston, an innocent fifteen-year-old student, was shot in the head and killed while in the halls of A. Maceo Smith High School.  Drumestic Contreal Brown, a non-student, took a school bus to get to the school, entered the school building, created a disturbance, and ultimately fired the shot that killed Gaston.

While this story would be tragic in any school, the trauma is

14

magnified in this case by the apparent ineptitude and fecklessness of the school district and school officials in ensuring student safety.    School policy required students to purchase school identification badges, but there was no one to check them.   The school also had metal detectors on the premises, but they were packed away in boxes.  The majority opinion refuses to acknowledge that these security measures were aimed at preventing the precise incident that transpired on October 23, 1991.  The purpose of these measures is clear and self-evident.  The ID badges were intended to control the presence of non-students on campus, not to serve as useless decoration.  The metal detectors were intended to eliminate the presence of weapons on the school grounds, not to consume space and collect dust like museum pieces.  The target of these detectors are the guns and knives fueling the violence in our schools.[1]

Both of these security measures were inadequately employed, and Brown was able to commit his fatal deed.  If the school had not completely disregarded its security measures, Brown might have been prevented from roaming the school halls and his gun might have been detected.  Indeed, this lawsuit might never have materialized, and

---

[1]Because this case was dismissed prematurely, the plaintiff was not permitted to develop additional evidence relating to the aggregate state of affairs at the school.  Inferences of safety and dangerousness require a fact-finder to examine and weigh additional evidence relating to the aggregate state of affairs at the school.  Recognizing the nature of the security measures at A. Maceo Smith High School does not necessarily compel an inference of dangerousness, as the majority seems to suggest.  An objectively safe school might implement security measures to maintain and safeguard its security and reputation.  The purpose of a trial is to permit a fact finder to draw inferences based on evidence adduced through the discovery process.

Gaston would have finished his studies at A. Maceo Smith High School.

The majority and the district court concluded that the pleadings did not sufficiently allege facts or present a legal basis for recovery. I respectfully disagree on both counts.

The complaint in this case alleges sufficient facts to survive a Rule 12(b)(6) attack. In dismissing this case, the district court relied in part on *Streetman v. Jordan,* 918 F.2d 555 (5th Cir.1990). The district court essentially held that the plaintiff did not allege facts with sufficient specificity to overcome the heightened pleading requirement for § 1983 claims. *See Streetman,* 918 F.2d at 557. However, the Supreme Court invalidated the heightened pleading requirement in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* --- U.S. ----, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). *Leatherman* held that plaintiffs in § 1983 cases need only meet the pleading requirements established in Federal Rule of Civil Procedure 8(a). *Id.,* --- U.S. at ----, 113 S.Ct. at 1161. Our system of pleading has evolved from the ancient system of the forms of action to the modern notice pleading standard. We should not return to the feudal days of microscopic analysis of pleadings, but rather embrace the present and future. The plaintiff's pleadings need only adumbrate the evidence expected in the prosecution of the case. Thus,

> "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."

16

*Taylor v. Ledbetter,* 818 F.2d 791, 794 n. 4 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Miller v. Stanmore,* 636 F.2d 986 (5th Cir.1981); *Johnson v. Wells,* 566 F.2d 1016 (5th Cir.1978)). This case should not be prematurely dismissed and the plaintiff should be permitted to develop evidence to support his claims. Other courts have upheld analogous claims. *See e.g., Waechter v. School Dist. No. 14-030,* 773 F.Supp. 1005, 1010 (W.D.Mich.1991); *Lichtler v. County of Orange,* 813 F.Supp. 1054 (S.D.N.Y.1993); *Pagano v. Massapequa Public Schools,* 714 F.Supp. 641, 643 (E.D.N.Y.1989); *cf. Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir.1987).

The majority posits and refutes two potential theories for recovery in this case. I find the majority's application of the facts to each theory problematic.

## I.

The majority recognizes that under the due process clause of the Fourteenth Amendment, a state actor is held accountable for foreseeable injuries when it creates or permits a dangerous situation. *See Salas v. Carpenter,* 980 F.2d 299, 309 (5th Cir.1992). This principle has been labeled the state-created danger doctrine. Although the plaintiff's pleadings set forth the requisite elements of a state-created danger claim, the majority not only refuses to find them but also denies the plaintiff the opportunity to demonstrate the state-created danger at A. Maceo Smith High School on October 23, 1991.

17

The majority distills three elements that constitute the state-created danger doctrine from prior cases. The first element is whether the environment was dangerous. The second is whether the state actors knew the environment was dangerous. The final element is whether the state actors created an opportunity that would not otherwise have existed for the injury to transpire. The requisite allegations in the pleadings will be examined below.

The state forced Gaston to attend A. Maceo Smith High School through its compulsory education laws. *See* Tex.Educ.Code Ann. § 21.032(a) (Vernon 1987 & Supp.1993). The majority points out that to claim Gaston attended school voluntarily is to deny reality.[2] *See* Majority Op. at 780-81, n. 7; *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School,* 972 F.2d 1364, 1380 (3rd Cir.1992) (Sloviter, C.J., dissenting), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) ("The compulsory nature of public school attendance is not lessened by the fact that a few fortunate students have the option to attend private school or be educated at home.").[3] A. Maceo Smith High School was arguably

---

[2]Thus, this court's decision in *Leffall* is clearly distinguishable from the instant case. *Leffall v. Dallas Independent Sch. Dist.,* 28 F.3d 521 (5th Cir.1994). We are not attending an after-school dance in this case, where students must pay for the privilege to attend, as was the case in *Leffall.* In this case, we are attending school, studying our books, and attendance is mandatory.

[3]The Supreme Court has gone further, stating that

> "[l]aw reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme."

*Lee v. Weisman,* --- U.S. ----, ----, 112 S.Ct. 2649, 2658,

18

dangerous on October 23, 1991.  While schools may not be *per se* dangerous, the plaintiff should be given an opportunity to prove that A. Maceo Smith High School was dangerous.  The very limited discovery in this case reveals past instances of school violence. Additional evidence and testimony might have further indicated dangerousness.[4]  The fact-finder, after a trial, should have considered the evidence and determined whether A. Maceo Smith High School was dangerous or safe on October 23, 1991.

Without factual development, we should not pass with finality on the knowledge and level of culpability of the school district and officials in this case.  The majority's interpretation of "actual knowledge" seems too cramped in view of § 1983 jurisprudence.  The Supreme Court and this court have held that liability may attach to the state through inaction or nonfeasance as well as through action and malfeasance.  *Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (holding that a failure to promulgate a policy may demonstrate deliberate indifference and be grounds for liability under § 1983);

---

120 L.Ed.2d 467 (1992).

[4]The mere presence of trained adults on school grounds does not negate the potential dangerousness of the school.  If trained individuals were deliberately indifferent to the plight of the students, the school might be as dangerous or more dangerous than if they were not present.  The parents may have relied upon the presence of trained adults, and therefore not pressed for additional security measures.  "Failing to act may, under certain circumstances, be more detrimental than acting."  *Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 800 (11th Cir.1987); *see also P.L.C. v. Housing Authority,* 588 F.Supp. 961 (W.D.Pa.1984) (holding that a duty arose through detrimental reliance).

*Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 454 (5th Cir.1994), *cert. denied,* --- U.S. ----, 113 S.Ct. 1066, 122 L.Ed.2d 371 (1993) ("We ... hold that a school official's liability arises ... when the student shows that the official, *by action or inaction,* demonstrates a deliberate indifference to his or her constitutional rights.") (emphasis supplied).[5]  We stated in *Gonzalez v. Ysleta Indep. Sch. Dist.* that

> "[t]he "deliberate indifferent' requirement permits courts to separate *omissions* that "amount to an intentional choice' from those that are merely "unintentionally negligent oversight[s].' "

996 F.2d 745, 756 (5th Cir.1993) (emphasis supplied) (quoting *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992)); *see also Salas v. Carpenter,* 980 F.2d 299, 307 (5th Cir.1992).  The deliberate indifference standard is a high legal threshold,[6] used to distinguish simple negligence from the type of willful blindness that is so extreme that it qualifies as active conduct for

---

[5]*See generally, Actionable Inaction:  Section 1983 Liability for Failure to Act,* 53 Univ.Chi.L.Rev. 1048 (1986).

[6]The deliberate indifference standard is difficult to meet for several reasons.  One reason is to prevent the Fourteenth Amendment from becoming a "font of tort law." *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (citations omitted).  Another reason is to protect state actors from excessive financial exposure. *See Canton v. Harris,* 489 U.S. 378, 391-92, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).  The latter seems to be one of the majority's primary concerns. *See* Majority Opinion at 780-81 & n. 7.  The proper way to address this concern is through the use of a high culpability requirement and requiring that the deliberate indifference "be closely related to the ultimate injury." *Canton,* 489 U.S. at 391, 109 S.Ct. 1206.  Insulating deliberately indifferent school districts and officials by preventing student suits goes to far to protect the public fisc at the expense of defenseless school children.

determining culpability. *Id.* *See also Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 722-23 (4th Cir.1991), *cert. denied, ---* U.S. ----, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992) (citing cases of deliberate indifference); *Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1145 (3d Cir.1990); *White v. Rochford,* 592 F.2d 381, 385 (7th Cir.1979) (discussing liability based on gross negligence and reckless disregard for the safety of others). The language found in these opinions demonstrates that the defendants here may be liable under § 1983 for inaction and failure to obtain knowledge about the school's security. The plaintiff effectively alleged that the school officials were deliberately indifferent to the danger at the high school, in that they knew or should have known about the environment at A. Maceo Smith High School. At this stage of the litigation, it is understandable that the plaintiff does not have an abundance of evidence of the nebulous mental state of the officials. *Cf. Thornbrough v. Columbus and Greenville R. Co.,* 760 F.2d 633, 640 (5th Cir.1985) (discussing the difficult task of proving defendants' mindsets). However, that does not justify denying the plaintiff his day in court to attempt to show what may be difficult but still possible to prove. Furthermore, there is no evidence in this record to support the majority's assertion that the risk of a non-student invader was unforeseeable by the defendants. The majority claims it is inappropriate to draw an inference of knowledge from the security measures in this case, because such an inference would discourage schools from taking steps to ensure student safety in the future. However, it is just

21

as inappropriate to draw an inference of safety from these security measures. Furthermore, the majority's position effectively rewards official ignorance and irresponsibility. The courts should encourage student safety, not half-hearted security policies. In addition, even without an inference of dangerousness or knowledge from these measures,[7] there is a past history of firearms and violence at A. Maceo Smith High School which, in conjunction with other evidence that might have come to light through further discovery, could have proved whether the school was the dangerous or safe.[8] Based on this record, we cannot know whether A. Maceo Smith High School was a paragon of security or a "snake pit."[9]

Finally, the majority requires an extreme showing of affirmative action from school officials, as it concludes that the defendants cannot be liable because they "did not release a known criminal in front of [Gaston's] locker." Majority Op. at 779. This position depreciates § 1983.[10] If the majority's logic were

---

[7]Such an inference does not require a great leap of faith. The ID badge policy seems to be aimed at distinguishing students who belong on campus from strangers, and the metal detectors are a step in eliminating the presence of weapons from school grounds. Taken together, these two measures seem to indicate that the presence of armed non-students was, or should have been, foreseeable to the school officials.

[8]*See* Answers to Interrogatories. The only discovery allowed in this case was in the form of one set of interrogatories.

[9]*Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982).

[10]Some courts have implied that the action/inaction distinction is crucial in determining whether the students may recover for injuries from the school districts and officials. *See, e.g., D.R. by L.R. v. Middle Bucks Area Vo. Tech. School,* 972 F.2d 1364, 1373-75 (3d Cir.1992); *J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990). However,

followed, then a school that was deliberately indifferent to the risk of fire would be immune to suits for fire related injuries as long as the principal did not strike the match. This simply cannot be true. The state need not be the last link in the causal chain to be liable for injuries. In *Estelle,* the Court found a duty for the state to provide medical care for injuries that were not caused by a state actor, but rather through the performance of a work assignment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Youngberg,* the Court acknowledged that the institutionalized patient has a right to medical care even though the state did not cause his injuries. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *see also Lichtler v. County of Orange,* 813 F.Supp. 1054, 1056 (S.D.N.Y.1993) (stating that a county could liable for student injuries resulting from a tornado which struck during school hours). If the state places an

---

other cases have criticized a curtailed and limited view based on an act/omission distinction because it leads to contrived and artificial results.

> "We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."

*Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). *See also White v. Rochford,* 592 F.2d 381 (7th Cir.1979) ("[I]t seems incongruous to suggest that liability [under § 1983] should turn on the tenuous metaphysical construct which differentiates sins of omission and commission."). Indeed, the Supreme Court stated deliberate indifference may result from acts or omissions. *Estelle,* 429 U.S. at 104-05, 97 S.Ct. at 291.

23

individual in a precarious situation, it cannot avoid liability if the peril materializes in the form of injury. Foreseeability is a question of fact and is not to be answered by speculative conclusions.

## II.

The majority presents and rejects the notion that a public school owes its students any duty to maintain a reasonably safe environment in which to conduct classes. The majority bases this conclusion primarily on *DeShaney v. Winnebago County Dep't Soc. Serv's.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and some circuit cases interpreting *DeShaney.* However, *DeShaney* does not foreclose the possibility of some obligation to protect students from violence in public schools. The *DeShaney* Court stated that when the state takes custody of an individual, an affirmative duty arises under § 1983 to ensure the individual's safety and well-being. 489 U.S. at 199-200, 109 S.Ct. at 1005. Thus, the court's inquiry is two-fold. The court must determine whether Gaston was in state custody, and if so, whether the state breached its duty to safeguard him.

The majority found that Gaston was not in state custody. Determining whether an individual is in state custody is typically accomplished by examining whether the state has isolated the individual from sources of private aid, or when,

> "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for basic human needs—*e.g.,* food, clothing, shelter, medical care, and *reasonable safety*...."

24

*DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005 (citations omitted) (emphasis supplied).  A "special relationship" between the state and the individual arises when the state takes the person in custody.[11]  In this case, the majority finds that Gaston was not in

[11]The term "special relationship" has become talismanic and complicated.  *Archie v. Racine,* 847 F.2d 1211, 1223 (7th Cir.1988).  This court has expressly avoided determining whether a school has a special relationship with its students.  *See Leffall,* 28 F.3d at 528-29;  *Doe v. Taylor Independent Sch. Dist.,* 15 F.3d 443, 451 n. 3.  Some courts have noted difficulty with the concept.

> "The contours of what constitutes a "special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct."

*Ellsworth v. Racine,* 774 F.2d 182, 185 (7th Cir.1985). However, there are several examples of special relationships from prior cases.  *See, e.g., Estelle,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91 (state owes duty to prison inmates); *Youngberg,* 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2458 (state owes duty to mental patients).  Indeed, at least two circuits have intimated that a special relationship is not required to find custody or a duty to protect individuals.

> "Nothing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates....  Liability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon the existence of a "special relationship' between the municipal officials and the individuals harmed."

*Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 725 (3d Cir.1989) (citing *Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) and *Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir.1989), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989));  *see also Jensen v. Conrad,* 747 F.2d 185, 194 (4th Cir.1984), as discussed in *Swader v. Virginia,* 743 F.Supp. 434, 439 (E.D.Va.1990) (stating *Jensen* survives *DeShaney*) ("a right to affirmative protection need not be limited by a determination that there was a "custodial relationship.' The *Fox* [*v. Custis,* 712 F.2d 84 (4th Cir.1983) ] court ruled that a right to protection could arise from a custodial *or*

25

custody because he could go home at the end of the day and he was not locked in a cell. However, "the concept of "custody' is not so rigid as to be defined only in terms of a prison or mental hospital." *Swader v. Virginia,* 743 F.Supp. 434, 439 (E.D.Va.1990).[12] Gaston's parents may have been responsible for his food, clothing, shelter, and medical care, but both Gaston and his parents relied on the school to ensure his safety so that he might

*other relationship.*") (emphasis original).

[12]There are many examples of special relationships and custody in cases applying § 1983. *See e.g., Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 723-34 (3d Cir.1989); *Milonas v. Williams,* 691 F.2d 931, 942 (10th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983) (finding that juveniles in boarding school in state custody). Courts have found a duty when the state takes a child from the natural parents and places the child under state supervision in order to secure an adoption. *Griffith v. Johnston,* 899 F.2d 1427, 1439 (5th Cir.1990) (a "special relationship [arose] when [the state] removed [children] from their natural homes and placed them under state supervision"); *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 849 (7th Cir.1990); *Taylor v. Ledbetter,* 818 F.2d 791, 795 (11th Cir.1987) (en banc). A duty arises to protect prison inmates from other inmates. *DeMallory v. Cullen,* 855 F.2d 442, 445 (7th Cir.1988). A special relationship was found between the state and a confidential informant's wife. *G-69 v. Degnan,* 745 F.Supp. 254, 265 (D.N.J.1990). *See also Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983) ("[a constitutional right to protection by the state] may arise out of special custodial or other relationships created or assumed by the state"); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982); *Simmons v. Philadelphia,* 947 F.2d 1042, 1067 (3rd Cir.1991) (state owed duty of safety to pre-trial detainee due to custody); *Horton v. Flenory,* 889 F.2d 454, 458 (3d Cir.1989) (state owed duty to suspect in private club based on functional custody by police officer); *Lichtler v. County of Orange,* 813 F.Supp. 1054, 1056 (S.D.N.Y.1993) ("Since power implies responsibility, where governmental agencies or entities utilize sovereign compulsion to exercise coercive powers, a correlative duty exists of due care toward those subjected to such compulsion.").

26

return home.[13]  Thus, this case is analogous to *Griffith v. Johnston,* where this court found that the state owed a duty to children removed from their homes and placed under state supervision.  899 F.2d 1427, 1439 (5th Cir.1990).[14]  The parents clearly entrusted their children's safety to the school district.  Indeed, state law places a school *in loco parentis.  See* Majority Op. at 780-81 n. 7.  Schools often use their role as a justification for their actions affecting a student's rights.  *See*

---

[13]*Maldonado v. Josey,* 975 F.2d 727, 735 (10th Cir.1992) ("I cannot fathom who, other than a teacher or other school staff member, is capable of ensuring the "reasonable safety' of school-children during the school day and class periods.") (Seymour, concurring).

[14]Other circuits have followed this approach in the foster care context.

> "Here, in contrast, the state removed a child from the custody of her parents;  and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner....  In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions."

*K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 849 (7th Cir.1990) (citations omitted). *See also Yvonne L. v. New Mexico Dep't of Human Serv's.,* 959 F.2d 883 (10th Cir.1992) (holding that children in the state's custody are owed an affirmative duty of protection);  *Doe v. New York City Department of Soc. Serv's.,* 649 F.2d 134 (2d Cir.1981), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

*New Jersey v. T.L.O.,* 469 U.S. 325, 336-41, 105 S.Ct. 733, 739-42, 83 L.Ed.2d 720 (1985) (recognizing a school's "need to maintain an environment in which learning can take place"); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 684, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). Under the rule pronounced by the majority today, parents who want to attempt to protect their children from any harm will have to take turns standing guard at the school building and playground.

At this stage in the lawsuit, it is premature to suggest whether the alleged failures on the part of the school district and school officials should be characterized as negligent, grossly negligent, callously indifferent, or any other legal label imposing liability. Let us return to our role of reviewing the law, and allow the fact-finder to determine the facts. Pleading strictures should not be used to prevent cases where the pleadings do not provide extremely detailed factualistic assertions. Let us take steps to ensure that our schools do not become shooting galleries or places where criminals are free to roam and terrorize the student body. Our schools should be places of learning, and personal safety is a vital component of a learning environment.